UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TASCHA ROBINSON                  :
                                 :   NO. 1:04-CV-00092
        Plaintiff,               :
                                 :   **OPINION & ORDER**
                                 :
                                 :
   v.                            :
                                 :
                                 :
Hilton Hospitality, Inc., et.    :
al.,                             :
                                 :
        Defendants.              :


        This matter is before the Court on the Defendant Hilton

Hospitality, Inc., et. al.'s (hereinafter "the Hotel") Motion for

Summary Judgment (doc. 21), the Plaintiff Tascha Robinson's

Memorandum in Opposition to the Hotel's Motion for Summary Judgment

(doc. 24), and the Hotel's Memorandum in Support of Its Motion for

Summary Judgment (doc. 28). Furthermore, the Court held a Hearing

on the Hotel's Motion for Summary Judgment (doc.

**FACTS & PROCEDURAL HISTORY**

        The following facts are taken from Plaintiff's Complaint

(doc. 1), the Hotel's Motion for Summary Judgment (doc. 21), and

Plaintiff's Opposition thereto (doc. 24). Plaintiff is thirty-two

years old, female, and African-American (doc. 1). Plaintiff was

employed by the Hotel for approximately ten years before her

termination in March 2002 (Id.). The Hotel owns and operates

hotels under the Embassy Suites Hotel brand and does business

within Hamilton County, Ohio (Id.).

        Plaintiff began her employment with the Hotel in August

1992 as a member of its sales department at the Embassy Suites Hotel in Blue Ash, Ohio (Id.). In 1995 the Hotel promoted Plaintiff to the position of Front Desk Supervisor (Id.). Plaintiff avers that throughout her employment with the Hotel she was a loyal, dedicated and highly qualified employee (Id.). During her employment, Plaintiff expanded her skill-set and knowledge-base by attending multiple corporate training seminars (Id.). The Hotel maintains that Plaintiff was a "good" employee but not "exceptional" and "demonstrated some potential" (doc. 21). The Hotel maintains that Plaintiff was repeatedly disciplined throughout her tenure as an employee with the Hotel (Id.). In fact the Hotel reports that Plaintiff received "write-ups" for her attendance problems in December 1996, November 1999, December 1999, and June 2000 (Id.). Plaintiff counters, noting that any perceived attendance problems she may have had were a result of either personal or family illnesses (doc. 24). The Plaintiff maintains that Gary Porteous (hereinafter "Porteous"), the Hotel's General Manager, concedes that it would be inconsistent with the Hotel's policy to factor absences due to illness, sick children or funerals into the determination that an employee had an attendance problem (Id.).

Plaintiff was scheduled to work on March 18, 2002; yet, she did not show-up to work that day (doc. 21). Kelli Vernon (hereinafter "Vernon"), Plaintiff's cousin, an employee of the Hotel, and a subordinate to Plaintiff, informed the Hotel that

Plaintiff had gone to the hospital that day as a result of what Vernon described as a "nervous breakdown" (Id.). The Hotel maintains that Vernon did not explain Plaintiff's condition nor did she provide the Hotel with a date upon which Plaintiff would be able to return to work (Id.). Citing Plaintiff's deposition, the Hotel states that Plaintiff acknowledged she did not contact the Hotel on March 18, 2002 to discuss her medical condition (Id.). Plaintiff alleges that her boyfriend, Shawn Elliot (hereinafter "Elliot") and her mother, Deborah Hamilton (hereinafter "Hamilton"), alerted the Hotel as to her medical condition (Id.). However, the Hotel asserts that in Elliot and Hamilton's depositions both deny having any conversations with representatives from the Hotel (Id.).

Plaintiff avers that she had a history of clinical depression, for which she received medical treatment and hospitalization (doc. 24). According to Plaintiff's March 18, 2002 medical records, she was "crying, inconsolable, unable to make eye contact . . [and] unable to communicate" (Id.). Plaintiff ultimately was transported to the emergency room and was reported to have had a "nervous breakdown" (Id.). Plaintiff submits that the doctor notified the Hotel that she was being transported to the emergency room, highlighting that the Hotel did learn of her illness from another source besides Vernon (Id.). Plaintiff was treated in the psychiatric division of the emergency room (Id.). She was prescribed "Trazodone," a powerful sleeping pill and

-3-

antidepressant (Id.).

According to the Hotel, Plaintiff did not show-up for work on March 19, 2002 (doc. 21). Nor did she contact the Hotel to advise it that she would be out that day (Id.). Plaintiff again maintains that Elliot and/or Hamilton contacted the Hotel (Id.). However, the Hotel maintains that Elliot and Hamilton do not recall if they contacted the Hotel concerning Plaintiff's illness in the weeks following her absence on March 18, 2002 (Id.). The Hotel asserts that the first time it received any information regarding Plaintiff's expected return date was on approximately March 25, 2005 (Id.). On this date, Plaintiff submitted to the Hotel a physician's note stating that she would be off work until April 1, 2002 (Id.). The Hotel asserts that at no point has Plaintiff presented any documentation medically excusing her absence from work between March 18, 2002 and March 25, 2002 (Id.). Per Plaintiff's physician's instructions, the Hotel did not schedule her to return to work until April 1, 2002 (Id.).

The Hotel notes that Porteous was scheduled for vacation to commence April 1, 2002 (Id.). He was not scheduled to return until the following Monday, April 8, 2002 (Id.). Because of this absence, the Hotel contends that Porteous telephoned Plaintiff to confirm her return to work on April 1, 2002 (Id.). This telephone call was made on March 29, 2002 (Id.). According to the Hotel, Plaintiff indicated that she would indeed return to work on April 1, 2002 (Id.). However, the Hotel notes that Plaintiff did not

-4-

return to work on April 1, 2002 (Id.).  The Hotel argues that it was unaware of the reason Plaintiff did not return to work that day (Id.).  The Hotel maintains that Plaintiff thought her mother informed the Hotel of another "depressive episode" on April 1, 2002 that prevented her from returning to work (Id.).  The Hotel highlights, however, that Hamilton did not have a conversation with any Hotel representatives on April 1, 2002 (Id.).  The Acting General Manager (in Porteous' absence), Shelley Henderson (hereinafter "Henderson"), documented Plaintiff's failure to return to work and that Plaintiff failed to notify the Hotel of such (Id.).

Plaintiff takes issue with the Hotel's assertion that it was unaware that she was receiving treatment for depression and unable to attend work through March 25, 2002 (doc. 24).  Plaintiff points to several facts supporting this contention:

> (1) Plaintiff's doctor notified the Hotel that she was transported to the emergency room on March 18, 2002;
> (2) Vernon kept the Hotel informed of Plaintiff's ongoing condition;
> (3) Plaintiff had personal conversations with her supervisors at the Hotel on an almost daily basis during her absence;
> (4) Porteous' own notes concerning the events of Plaintiff's medical leave indicate that he was aware of her "emotional breakdown" on March 18, 2002;
> (5) Porteous called the Plaintiff at home, post-March 18, 2002, to check in and see how she was doing (Porteous' notes indicate Plaintiff told him that she was on medicine, didn't feel well, and would call the following week when she felt better);
> (6) Porteous was personally aware that Plaintiff was seeking treatment for

-5-

> depression; and
> (7) the Hotel sent flowers and a get-well-soon
> card within the first few days following
> Plaintiff's admission to the emergency room.

(Id.). Thus, the Plaintiff concludes that the Hotel had to know she was seeking treatment and that she would contact the Hotel sometime the following week (Id.).

As for the Hotel's awareness that Plaintiff continued to suffer from depression through April 1, 2002, the Plaintiff points to the doctor's note, dated March 25, 2002, which stated she could not return to work until April 1, 2002 (Id.). This note was delivered to the Hotel and the Hotel does not dispute that it was in possession of the note (Id.). As such, the Plaintiff argues that the Hotel was notified of her need for medical leave through April 1, 2002 (Id.).

Vernon was suspended by Henderson on April 4, 2002 (doc. 21). Vernon contacted Plaintiff to inform her of the suspension (Id.). Plaintiff requested that Vernon give the phone to Henderson (Id.). Plaintiff expressed her frustration with the situation and the Hotel alleges that Plaintiff stated: she would not come back "until Wednesday because of all this [(i.e., Vernon's suspension")], if I come back at all! I'm done with this. I quit! You all do whatever!" (Id.). The Hotel notes that Plaintiff acknowledges using the phrase "I quit" during this telephone conversation (Id.).

Plaintiff submits that she suffered another depressive episode shortly before April 1, 2002, rendering her unable to

-6-

return to work (doc. 24). Plaintiff's conversation with Henderson, as detailed above, allegedly caused Plaintiff even greater distress and Plaintiff's version of the conversation is that she told Henderson she could not "let them drive her crazy . . . [and that t]he doctor already told me that I'll go crazy, and I can not afford that . . ." (Id.). Henderson's account of this conversation - namely, that Plaintiff reported an intention to resign - is incorrect, asserts Plaintiff (Id.).

The Hotel maintains that as Henderson was only the Acting General Manager she did not feel comfortable accepting Plaintiff's alleged resignation at that time (doc. 21). Henderson felt that any action should be postponed until Porteous' return (Id.). As such, the Hotel maintains that it expected Plaintiff to return to work on April 8, 2002 (Id.). Yet, Plaintiff did not return on the 8th of April 2002 (Id.). Plaintiff disputes that she notified anyone at the Hotel that she would return to work on the 8th (doc. 24). Porteous attempted to contact Plaintiff at the end of the day on April 8, 2002, but could not get in touch with her (doc. 21). Plaintiff's answering machine provided a cell phone number at which she could be reached (Id.). The following day, Porteous called the cell phone number and reached Plaintiff (Id.). Plaintiff was dining at a restaurant and the Hotel claims Plaintiff indicated she would return to work on April 15, 2002 (Id.). Porteous reminded Plaintiff that she had exhausted all of her Paid Time Off (PTO) and sick days, but the Hotel had continued to pay her during her time

-7-

off (_i.e._, for 127 hours in which Plaintiff did not have sick or PTO coverage) (_Id._).

The Hotel contends that Plaintiff called Porteous and informed him that she had a doctor's appointment scheduled for 11:00 A.M. on the 15th (_Id._). Plaintiff inquired whether she should report to work in the morning, leave for her appointment, and then return or simply come into work after her appointment (_Id._). Porteous informed her to come into work after her appointment (_Id._). Porteous purportedly reminded Plaintiff to bring in documentation excusing her from the days she had missed (_Id._). Plaintiff did not report to work on the 15th (_Id._). Nor, contends the Hotel, did Plaintiff contact any Hotel representative to notify the Hotel that she would not be at work that day (_Id._).

Plaintiff maintains she obtained another physician's note excusing her from work through May 7, 2002 (doc. 24). Plaintiff contends that she gave this note to the Hotel during the first week of April 2002 (_Id._). The Hotel does not acknowledge receiving this note (_Id._). Plaintiff avers that Porteous then contacted her (after receiving this second note) requesting that she return to work on April 15, 2002 as opposed to May 7, 2002, in order to assist with a large group that would be staying at the hotel (_Id._). Porteous supposedly told Plaintiff to acquire another note from her physician indicating a release to work date of April 15, 2002, so that she could return to work (_Id._). Plaintiff alleges she told Porteous that she would contact her physician to inquire whether

-8-

this would be advisable; Plaintiff, in response to this request, scheduled an appointment with her doctor for April 15, 2002 to see if she could return to work that day (Id.).

On April 15, 2002 Plaintiff contacted Vernon at the Hotel and, according to the Hotel, informed Vernon that she was voluntarily resigning (doc. 21). Vernon allegedly reported this information to Henderson; Henderson then relayed the information to Porteous (Id.). Porteous discussed with Vernon the substance of the telephone conversation she had just had with Plaintiff (Id.). Vernon allegedly confirmed the contents of the discussion, as described above, and memorialized said conversation in writing (Id.). Subsequently, Porteous accepted Plaintiff's resignation and instructed Henderson to post a notice that Plaintiff's position was now available (Id.). That night Porteous spoke with Plaintiff and informed her that he was accepting her resignation (Id.).

Plaintiff's rendition of that day's events, however, differ substantially (doc. 21). According to Plaintiff, on the morning of April 15, 2002, she suffered yet another depressive episode (Id.). During this episode, Plaintiff contacted the Hotel and requested to speak to either Henderson or Porteous (Id.). Both were unavailable, so Plaintiff spoke to Vernon (Id.). This is the conversation in which Plaintiff allegedly told Vernon that she quit and which the Hotel views as extremely significant in this litigation. Plaintiff, not surprisingly, views the substance of this conversation quite differently than does the Hotel (Id.).

-9-

Plaintiff reports that she told Vernon:

> I just feel like I can't take it anymore.
> It's just like I just feel really stressed.  I
> just feel like quitting, like giving up.  I
> can't take it anymore . . . I just can't take
> life anymore.  I can't deal with everything
> that's going on . . . Every time I think I'm
> better, then I'm not.

(Id.).  Plaintiff submits that she had no intention of quitting her job; but, rather, Plaintiff contends that her conversation expressed a desire to "quit life" as opposed to the interpretation the Hotel makes (Id.).

Subsequent to this conversation between Plaintiff and Vernon, Vernon contacted Hamilton (Id.).  According to Hamilton, Vernon stated:

> Aunt Deb, I just talked to . . . [Plaintiff]
> and something is wrong.  She's crying and she
> won't stop crying.  I'm scared for her.  I
> don't know what's going on.  She just keeps
> telling me, 'I can't do this any more.  I
> can't do this any more.  I quit.  I quit.  I
> can't live like this.  I quit.'

(Id.).  Hamilton went straight to Plaintiff's house and found her in a ball on the floor (Id.).  Hamilton sought medical attention for her daughter (Id.).

Hamilton allegedly attempted to contact the Hotel to inform it of her daughter's condition (Id.).  Porteous and others were still unavailable, so Hamilton spoke with Vernon (Id.).  Vernon reported that Porteous stated Plaintiff quit her job (Id.).  Hamilton moved Plaintiff to her home and then attempted to contact the Hotel again, hoping to speak with Porteous (Id.).  Porteous was

still unavailable and Hamilton told Vernon to tell Porteous that Plaintiff would contact him when she awoke (Id.).

Once awake Plaintiff called Porteous and told him that she could not return to work until May 7, 2002 (Id.). Plaintiff maintains that Porteous responded, stating "either you come back or I accept your resignation" (Id.). Plaintiff insisted that she had not quit, became very upset, and handed the phone to her mother (Id.). Hamilton spoke with Porteous and attempted to let him know that her daughter had not quit (Id.). She was unsuccessful (Id.). Porteous stated that he did not have to talk to Hamilton about her daughter (Id.).

Plaintiff notes that Porteous relied solely upon Vernon's alleged statement that Plaintiff had quit; neither Porteous nor Henderson attempted to contact Plaintiff personally (Id.). However, the Plaintiff notes that when Porteous did contact her, she insisted that she had not quit her job (Id.). The Plaintiff highlights the Hotel's inconsistency in classifying Plaintiff's termination (Id.). The Hotel's claim that Plaintiff put it on notice of her resignation is contradicted, Plaintiff maintains, by Porteous documentation concerning Plaintiff's termination, in which he noted that Plaintiff "quit without notice" (Id.). Furthermore, Henderson admits that Plaintiff did not abandon her position or voluntarily resign before April 8, 2002 and Porteous' admissions and notes indicate Plaintiff did not abandon her position between April 8, 2002 and April 15, 2002 (Id.). The Plaintiff states,

-11-

"[the Hotel] has . . . attempted to resolve this inconsistency by asserting . . . Plaintiff quit both with and without notice, quit with notice to a manager and employee, and/or quit on multiple occasions" (<u>Id</u>.).

The Hotel maintains that the only medical documentation Plaintiff provided was the doctor's note dated March 25, 2002, stating that Plaintiff was to be off work until April 1, 2002, denying that it ever received the second doctor's note mentioned above (<u>Id</u>.).  The Hotel maintains that the March 25, 2002 note indicated that Plaintiff was to be off for an "unspecified 'illness or virus'" (<u>Id</u>.).  The Hotel maintains that at no point has Plaintiff provided any other medical documentation indicating that she was unable to work from March 18, 2002 through March 24, 2002, April 1, 2002 through April 15, 2002, or that she had a serious health condition (<u>Id</u>.).  Lastly, the Hotel highlights Plaintiff's failure to follow its "well-established" policy for employees seeking a leave of absence (<u>Id</u>.).  A form is available that an employee must complete (<u>Id</u>.).  Plaintiff did not complete such a form (<u>Id</u>.).

**APPLICABLE LEGAL STANDARD**

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact [.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel,

-13-

Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. at 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-248 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-340 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

-14-

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotations omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991).

-15-

**ANALYSIS**

Plaintiff's sole claim is that the Hotel violated the Family Medical Leave Act, 29 U.S.C. § 2601 _et_ _seq._ ("FMLA"), in that the Hotel interfered with her FMLA rights and retaliated against her, through termination, contra to her rights under the FMLA (doc. 1).

_A._  _FMLA Interference_

The FMLA provides qualifying employees up to twelve weeks of unpaid leave each year if the employee has a serious health condition that renders the employee unable to perform the functions of her position. 29 U.S.C. § 2612. Interference by an employer with an employee's exercise or attempt to exercise his/her rights under the FMLA is prohibited. 29 U.S.C. § 2615(a)(1). A plaintiff claiming employer interference with protected FMLA rights must establish that: (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005), citing Cavin v. Honda of Am. Mfg. Inc., 346 F.3d 713, 719 (6th Cir. 2003). When making a FMLA interference claim, a plaintiff need only show by a preponderance of the evidence that she was entitled to the FMLA rights asserted. See e.g., Arban v. West Pub. Corp., 345 F.3d 390, 401 (6th Cir. 2003); King v.

-16-

<u>Preferred Technical Group</u>, 166 F.3d 887, 891 (7th Cir. 1999).

The Hotel does not dispute that Plaintiff was an eligible employee. Nor does the Hotel dispute that it is an employer as defined by the FMLA. However, the Hotel does maintain that Plaintiff was not qualified for leave, as she did not provide adequate notice of her need to take leave and her ailment was not a serious health condition as contemplated by the FMLA (doc. 21). Furthermore, the Hotel asserts that Plaintiff voluntarily resigned her position; therefore, Plaintiff is not entitled to the protection of the FMLA (<u>Id</u>.). The Court does not agree with the Hotel and finds that Plaintiff has at least raised a genuine issue of material fact as to whether she was entitled to FMLA leave.

The Court first addresses the Hotel's contention that Plaintiff voluntarily resigned. This is the Hotel's primary argument for granting its Motion. The Hotel aptly notes that "[w]hen an employee voluntarily resigns, he cannot claim that he suffered an adverse employment decision under the ADA or FMLA." <u>Hammon v. DHL Airways, Inc.</u>, 165 F.3d 441, 447 (6th Cir. 1999) (<u>internal citations omitted</u>). The FMLA does not define "resignation" and, accordingly, a court must use the definition as developed in "common law principles of agency and the master-servant relationship." <u>Id</u>.

Ohio common law recognizes two types of voluntary resignation: "constructive" and "effective." <u>Id</u>. at 448. Constructive resignation takes place in one of two ways. First,

-17-

through the employee's failure to comply with the employer's request requiring her to take certain action. Id. Second, through constructive abandonment of her position - i.e., by missing work for a substantial period of time. Id. Effective resignation requires the employee take two steps. Id. First, "the employee must express an intention to resign." Id. (internal citations omitted). And, second, "the employee must take some action to demonstrate that he is relinquishing his position." Id. (internal citations omitted).

The Hotel avers that Plaintiff "unequivocally resigned her employment" (in other words, an effective resignation) (doc. 21). The Hotel submits that Plaintiff did so twice. First, during the April 4, 2002 telephone conversation with Henderson and, second, during the April 15, 2002 telephone conversation with Vernon (Id.). As to the April 15, 2002 telephone call, the Court finds that a reasonable jury could view Plaintiff's words as an indication not that she quit her job but, rather, that she planned to "quit," in some form or another, life. This is not for the Court to decide.

Likewise, the Court finds that genuine issues of material fact exist as to whether Plaintiff actually "quit" during the April 4, 2002 telephone conversation. This is an issue requiring interpretation of words and a determination of credibility - i.e., does one believe Plaintiff or does one believe Henderson? Furthermore, evidence suggests that the Hotel did not consider

-18-

Plaintiff to have quit on April 4, 2002.  For example, Porteous' notes indicate that Plaintiff informed Henderson during this conversation that she would return to work on April 8, 2002 (although Plaintiff does not recall making such an agreement) (doc. 24).  In fact, the Hotel's current Motion specifically states, "[a]ccordingly, the Hotel expected Plaintiff to return to work on April 8" (doc. 21).  This statement begs the question: How can the Hotel assert that Plaintiff effectively resigned on April 4, 2002, yet, in the same Motion, assert that they expected her to return to work on April 8?  Clearly, an expectation that Plaintiff would return to work on April 8, 2002 defeats any argument that she effectively resigned on April 2, 2002.

It is unclear whether Plaintiff "express[ed] an intention to resign."  Genuine issues of material fact exist necessitating resolution by the trier of fact.  The Court need not address the second prong of an effective resignation, as the Hotel has not established the absence of any genuine issue of material fact concerning the first prong.

As to constructive resignation, the Court finds the argument of Plaintiff persuasive.  In a nutshell, the Plaintiff questions how constructive resignation could have occurred at any point between March 18, 2002 and Plaintiff's ultimate termination on April 15, 2002, when the Hotel itself did not view Plaintiff as having constructively resigned?  The Plaintiff points to several key facts.  First, the Hotel continued to pay Plaintiff through the

-19-

first week of April 2002 (doc. 24).  An argument by the Hotel that
Plaintiff abandoned her position between March 18, 2002 and March
25, 2002 is belied by the Hotel's own record of Plaintiff's
termination, effective April 15, 2002.  Turning to the time frame
of April 1, 2002 through April 15, 2002, the Plaintiff notes that
Porteous testified in deposition that under the Hotel's policy
Plaintiff did not abandon her employment (Id.).  The Plaintiff
highlights Porteous' notes, which indicate he discussed with
Plaintiff on April 9, 2002 her return to work on April 15, 2002
(Id.).  Plaintiff argues that the Hotel's  assertion that she
abandoned her position is unsupported by the record (Id.).  The
Court finds that at least a genuine issue of material fact exists
as to constructive resignation, as well.

       The Court turns next to whether Plaintiff's condition was
a "serious health condition" as contemplated by the FMLA.  The Code
of Federal Regulations provides guidance in determining what is a
"serious health condition."  See 29 C.F.R § 825.114.  This Section
states that a serious health condition results where an individual
is incapacitated (e.g., by an inability to work) for three
consecutive calendar days and subsequent "treatment by a health
care provider on at least one occasion which results in a regiment
of continuing treatment under the supervision of the health care
provider."  Id.  A regiment of continuing treatment can include "a
course of prescription medicine."  Id.  Furthermore a serious
health condition can be found where an individual is incapacitated

for at least three consecutive calendar days (as just noted) "and any subsequent treatment or period of incapacity relating to the same condition that also involves treatment two or more times by a health care provider." Id.

The Court finds the record clear that Plaintiff suffered from severe depression that incapacitated her for at least three consecutive calendar days. In so finding, the Court notes that Plaintiff has provided evidence of two visits to the doctor - one on March 18, 2002 and another on March 25, 2002, relating to her depression. Furthermore, Plaintiff also received a prescription to treat her depression. These two factors could lead a reasonable jury to conclude that Plaintiff suffered from a serious health condition as contemplated by the FMLA. The Court also finds that Plaintiff has provided evidence of a genuine issue of material fact as to whether this condition rendered her unable to perform the functions of her position. These issues should be determined by the trier of fact.

The Court now turns to whether Plaintiff provided notice sufficient under the FMLA. First, the Court notes that the Sixth Circuit is clear that "employers cannot deny FMLA leave on grounds that an employee failed to comply with internal procedures - as long as the employee gives timely verbal or other notice." Walton at 486. In Walton, the employer had a policy for requesting FMLA leave, which the employee was aware of and had followed in the past. Id. at 484. However, on the occasion giving rise to the

-21-

lawsuit, the employee in <u>Walton</u> failed to follow those procedures and instead simply contacted a security officer of the employer, informing the officer of his illness.  <u>Id</u>.  The Sixth Circuit thus turned its attention to whether the employee provided "sufficient notice that . . . [the employee] was invoking the protection of the FMLA."  <u>Id</u>. at 486.  As did the court in <u>Walton</u>, this Court does not find defective Plaintiff's claim merely because she failed to follow the Hotel's internal policies for requesting leave.

> The <u>Walton</u> court stated:
>
> To invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave.  The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.  While an employee need not expressly assert rights under the FMLA or even mention the FMLA, the employee must give the employer enough information for the employer to reasonably conclude that an event described in FMLA § 2612(a)(1)(D) has occurred.  What is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case.

<u>Id</u>. (<u>internal</u> <u>citations</u> <u>omitted</u>).  The <u>Walton</u> court continued, noting: "[w]e recognize that under the applicable regulations the employee need not expressly assert rights under the FMLA, or even mention the FMLA, but may only state that leave is needed.  The employer will be expected to obtain any additional required information through informal means."  <u>Id</u>. at 487; <u>see</u> <u>also</u>

Brenneman v. MedCentral Health Sys., 366 F.3d 412, 422 (6th Cir. 2004).

The Hotel cites George v. Russell Stover Candies, Inc., 106 Fed. Appx. 946, 2004 WL 1662024 (6th Cir. July 16, 2004), which states: "[t]he eligible employee must . . . give the employer . . . [a] substantive notice within the requisite time frame.  The time frame depends on the foreseeability of the needed leave."  Id. at 949.  The Hotel maintains that for sufficient notice to be established, a plaintiff must provide notice within the requisite time frame (doc. 21).  George further notes that 29 C.F.R. § 825.303(a) provides that an employee should submit notice as soon as practicable in light of the circumstances of each individual case.  George at 950-51.  However, 29 U.S.C. § 2612(e)(2)(B) requires an employee to:

> [P]rovide the employer with not less than 30 days' notice, before the date the leave . . . is to begin where that leave is foreseeable based upon planned medical treatment, but require[s] . . . [the] employee to provide such notice as is practicable where the date of treatment requires leave to being in less than 30 days.

Id. (internal citations omitted).  The court in George notes additionally, as discussed above, that once sufficient and timely notice is provided, "the employer bears the burden to gather any additional information necessary for the leave to fall within the FMLA."  Id.

In the instant matter, Plaintiff's condition and the

manifestation of that condition were not amenable to providing thirty days' notice. As such, the timeliness of Plaintiff's notice must have been made as soon as practicable in light of the circumstance surrounding this case. The Court finds that Plaintiff did so.

On March 18, 2002, the Hotel was notified by the hospital of Plaintiff's transportation to the emergency room. Deposition testimony indicates that Porteous was aware that Plaintiff was absent as a result of depression. A note, which is undisputed, was provided the Hotel by Plaintiff excusing her from work through April 1, 2002. This note is marked clearly with the language "major depressive episode." It is disputed whether Plaintiff provided a second note to Hotel, excusing her from work through May 7, 2002. Yet, it is a dispute not for the Court to decide; rather, it is a determination that lies with the trier of fact. Furthermore, there were at least several phone calls between Plaintiff and representatives of the Hotel, either Porteous, Henderson, or Vernon (calls which Vernon supposedly reported to her supervisors) in which Plaintiff's condition was discussed.

The Court views the record as indicating that the Hotel received repeated notice of Plaintiff's condition over the course of March 18, 2002 to April 15, 2002. Granted, the notice may not have been in a form the Hotel desired (i.e., through strict adherence to the Hotel's internal FMLA leave request policy). However, the notice was of such a nature that a reasonable jury

-24-

could find that it was sufficient and timely so as to put the Hotel on notice of Plaintiff's request for FMLA leave.

Accordingly, the Court finds that genuine issues of material fact exist as to Plaintiff's claim that the Hotel interfered with her FMLA protected rights. As noted, it is not disputed that Plaintiff is an eligible employee and that the Hotel is an employer within the meaning of the FMLA. And as discussed above, genuine issues of material fact are present as to whether Plaintiff was entitled to FMLA leave, whether she provided sufficient notice, and whether the Hotel denied her FMLA benefits to which she was entitled.

*B. FMLA Retaliation*

A FMLA retaliation claim is analyzed primarily under the familiar McDonnel-Doulgas/Burdine burden-shifting paradigm, where direct evidence of retaliation is absent. See e.g., Swanson v. Senior Resource Connection, 254 F. Supp. 2d 945, 951 (S.D. Ohio 2003) (Rice, J.). In the instant matter, Plaintiff does not assert direct evidence of retaliation. Accordingly, to establish her prima facie retaliation claim at the summary judgment state, she must present evidence sufficient to raise a genuine issue of material fact as to whether:

> 1. she engaged in an activity protected by the FMLA;
> 2. her exercise of this right was known by the Hotel;
> 3. thereafter, the Hotel took an employment action adverse to her; and

> 4. there was a causal connection between the protected activity and the adverse employment action.

Id. citing Canitia v. Yellow Freight Sys., Inc., 903 F.2d 1064, 1066 (6th Cir. 1990), cert. denied, 498 U.S. 984 (1990).

As in employment discrimination, non-FMLA retaliation, and Title VII claims, if the plaintiff establishes her prima facie case, the burden then shifts to the employer to proffer a legitimate, non-retaliatory reason for the adverse employment action. Id. (internal citations omitted). If the employer meets this burden, the employee is required to demonstrate that the proffered justification was merely pretext. Id. Pretext may be established by showing: (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the employer to take the adverse action; or (3) the proffered reason was insufficient to motivate the adverse action. Id.

The Court's previous analysis concerning FMLA interference establishes that genuine issues of material fact exist as to whether Plaintiff engaged in activity protected by the FMLA in requesting leave and whether the Hotel was aware of the request. Although Defendant argues that Plaintiff resigned her position, a reasonable jury could find she was terminated and, accordingly, suffered an adverse employment action. Thus, the first three elements of her prima facie FMLA retaliation claim have been demonstrated. The "causation" element can be established where

there is "[p]roximity in time between a request for FMLA-protected leave and discharge . . . [as] a plaintiff's burden in establishing a <u>prima facie</u> case is not meant to be an onerous one . . ." <u>Heady v. U.S. Enrichment Corp.</u>, 146 Fed. Appx. 766, 770, 2005 WL 1950793, *3 (6th Cir. Aug. 16, 2005).

Here, Plaintiff's request for FMLA protected rights and her ultimate termination were temporally close. Earlier Sixth Circuit opinions have stated, however, that more than a temporal connection is required to establish the causal link. <u>See</u> <u>e.g.</u>, <u>Brown v. Chase Brass & Copper Co., Inc.</u>, 14 Fed. Appx. 482, *490, 2001 WL 814931, *7 (6th Cir. July 10, 2001). Yet, the <u>Brown</u> opinion and others view the additional evidence of causality more as a part of defeating the employer's proffered legitimate reason, than of establishing the causal link. <u>Id</u>. As such, the Court finds that Plaintiff has establish the final element of her <u>prima facie</u> case - the causal link - through the temporal proximity of her termination and assertion of FMLA protected rights.

The Hotel's proffered non-retaliatory reason for terminating Plaintiff appears to be Plaintiff's alleged effective and/or constructive resignation (doc. 21). Yet, the Court has discussed thoroughly how the Hotel has failed to establish the absence of any genuine issue of material fact relating to Plaintiff's alleged resignation. Accordingly, this assertion has no basis in fact. Additionally, evidence that Plaintiff was disciplined for absences that included protected medical leave,

along with the fact that Porteous terminated Plaintiff to reach "closure," permits an inference that Defendant was motivated to terminate Plaintiff because of her asserted FMLA rights. Accordingly, Plaintiff has established a genuine issue of material fact as to her retaliation claim pursuant to the FMLA.  Summary judgment is not appropriate.

**CONCLUSION**

For the foregoing reasons, the Court hereby DENIES Defendants' Motion for Summary Judgment (doc. 21).  This matter is SET for a 3:00 P.M., March 30, 2006 Final Pre-Trial Conference and a April 11, 2006 Three-Day Jury Trial.


SO ORDERED.


Dated: February 28, 2006      /s/ S. Arthur Spiegel

                              S. Arthur Spiegel
                              United States Senior District Judge